UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| H. MICHAEL KIMBALL, WILLIS W. WHITE, DAVID BEARDMORE, THOMAS BALDRIDGE, ORLAND BADLEY, CLAYTON BADLEY and JERRY BADLEY,<br><br>                    Plaintiffs,<br><br>        v.<br><br>UNITED STATES OF AMERICA,<br><br>                    Defendant. | Case No. 1:12-CV-00108-EJL<br><br>**MEMORANDUM DECISION AND ORDER** |

        Pending before the Court in the above-entitled matter is the United States' Motion

to Dismiss or for Summary Judgment (Dkt. 13).  Having fully reviewed the record, the

Court finds that the facts and legal arguments are adequately presented in the briefs and

record.  Accordingly, in the interest of avoiding further delay, and because the Court

conclusively finds that the decisional process would not be significantly aided by oral

argument, this matter shall be decided on the record before this Court without oral

argument.

**MEMORANDUM DECISION AND ORDER - 1**

## BACKGROUND

Plaintiffs H. Michael Kimball, Willis W. White, David Beardmore, Thomas Baldridge, Orland Badley, Clayton Badley and Jerry Badley (collectively referred to as the "Plaintiffs") filed this lawsuit alleging negligence in the management of the Raines Fire in 2007 in the Payette National Forest.  The fire destroyed properties owned by Plaintiffs. Plaintiffs allege four discrete acts of negligence by the United States Forest Service ("Forest Service"): 1) the Forest Service negligently informed landowners to stay away from their homes; 2) the Forest Service failed to track human resources properly and did not plan for one crew to "time out"[1]; 3) the pumps and hoses the Forest Service used on the fire were not set up properly; and 4) the backfire set by the Forest Service on July 20, 2007 was negligent.

It is undisputed the Raines Fire started on July 7, 2007 and was not the only forest fire being managed in July.  The Incident Command Team was managing three fires in the area. The Raines Fire was started by a lightening strike and began burning in a designated wilderness area.  Early on, the Forest Service decided to suppress the fire, rather than manage it as a wildland fire, due to the potential for the fire to burn to the Salmon River and pose a threat to private properties. On July 17, 2007, two division supervisors were assigned to the Raines Fire: Mike Story and Craig Campbell. The Incident Command Team decided two hot shot crews would be assigned to the fire on

---

[1]Because firefighting crews work long days without break, the Forest Service has a policy that requires fire crews to take a break at certain intervals and this break is referred to as "timing out."  The Incident Commander is charged with tracking the "timing out" of crews in managing the resources available to fight a fire.

July 17th.  The Logan Hot Shots arrived on July 17th and the Lewis and Clark Hot Shots arrived at the Raines Fire on July 18th. These crews were instructed to construct fire lines and set up pumps and hoses for the purpose of structure protection.

It is undisputed that the Raines Fire grew in strength daily and was moving closer to the privately owned structures at the Badley Ranch, Copenhaver subdivision and Mackay Bar.  The Forest Service provided daily briefings on the Raines Fire to interested members of the public.

The Lewis and Clark Hot Shot crew had "timed out" and left their assignment at the Raines Fire at approximately 11:00 a.m on the morning of July 20, 2007.  Prior to leaving, the Lewis and Clark hot shots had set up pumps and hoses around some of the Badley structures.  A replacement hot shot crew arrived in McCall on July 20th but did not reach the Raines Fire until July 21st.

Potential high winds were expected on July 20th.  Firefighters were briefed that it was a "red flag" day which means they were expected to experience a need for lot of fire fighting.  In the afternoon around 1:30 or 2:00 p.m., the inversion lifted and high winds occurred causing the main Raines Fire to enlarge in size and speed.  Some of the Logan Hot Shots left camp at 12:30 p.m. intending to prepare for a burnout operation later that day or evening. At 1:30 p.m., Mike Hanson of the Logan Hot Shots was located at Copenhaver and heard trees starting to torch and the wind was causing spot fires to jump the existing fire line.  Hanson thought the burnout operation had begun.

**MEMORANDUM DECISION AND ORDER - 3**

Kendall Wilson, also of the Logan Hot Shots was located at Badley Ranch.  He had been told earlier in the day by Campbell that if the conditions permitted, they could start the burnout before the relative humidity dropped as the Badley Ranch was prepped. Wilson said the Logan Hot Shots did not see the pumps and hoses set up at Badley Ranch until the afternoon of the fire and found they were not operational.  It is unclear to the Court as to why the pumps and hoses were not operational – were they damaged in the cargo drop, were they not tested, were they damaged by the fire when it jumped the lines, or some other reason. It is undisputed the pumps were not soaking the land or structures when Wilson arrived.

It appears the pumps and hoses set up at Copenhaver worked until the fire caused the pumps to break down and/or the hoses to burn through.  Then the firefighters relied on the pump of landowner Clint Swain.

Once the high winds arrived on July 20th, the Raines Fire became very intense very quickly.  The record does not reflect that a "backburn" was set by the firefighters as it is undisputed that the weather and fire conditions were not conducive to a backburn being set.  Backburns had been done at night previously on this fire when the weather conditions were calm and the fire was weaker.

The firefighters' testimony and notes are consistent when they indicate the main fire was in the trees which led to crown fires which led to sparks flying in the wind which led to spot fires that eventually jumped the established fire line.  While a spot fire could have turned into a backburn fire unintentionally, the record also reflects the firefighters at

**MEMORANDUM DECISION AND ORDER - 4**

Badley Ranch "fired the line" which was an emergency backfire to attempt to slow down the main fire coming their direction and create black (burned) space between the main fire and the line for a safety zone for the firefighters by reducing the fuel between the firefighters and the main fire.  The testimony of firefighters at Badley Ranch is that the intentional "firing of the line" was unsuccessful as the main fire had become too powerful from the strong winds.  The "firing of the line" did not slow down the main fire.

The fire at the Lower Badley Ranch was exacerbated by the explosives or ammunition stored in certain outbuildings.  Once those items caught fire, the safety of the firefighters was priority one and it was no longer safe to try to save certain structures. It is undisputed that outbuildings at the Lower Badley Ranch were surrounded by vegetation that would serve as fuel for the fast approaching fire and no steps had been taken by the landowner to reduce the fuel around the structures.

In part due to the firefighters working with Luke Badley, the majority of the Upper Badley Ranch structures survived the fire. The firefighters at Copenhaver worked with Swain to save as many structures as possible, but once certain pumps failed and spot fires started, certain structures were lost at the Copenhaver subdivision.  Again, firefighter safety was the main objective after propane tanks exploded at certain structures.  The firefighters were successful in protecting the main structures at Mackay Bar.

The United States has filed a motion to dismiss or for summary judgment alleging this Court lacks subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) as the alleged negligent actions are subject to the "discretionary function exception" to the Federal Tort

**MEMORANDUM DECISION AND ORDER - 5**

Claims Act ("FTCA"), 28 U.S.C. §§ 2660(a) and the Plaintiffs are barred from bringing their claims.  Plaintiffs respond the exception does not apply to the particular alleged negligent actions raised in this lawsuit and the matter should proceed to trial on the disputed facts.

## STANDARD OF REVIEW

A defendant may move to dismiss a complaint for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) in one of two ways.  *See Thornhill Publ'g Co., Inc. v. General Tel. & Elec. Corp.*, 594 F.2d 730, 733 (9th Cir. 1979)).  The attack may be a "facial" one where the defendant attacks the sufficiency of the allegations supporting subject matter jurisdiction.  *Id.*  On the other hand, the defendant may instead launch a "factual" attack, "attacking the existence of subject matter jurisdiction in fact."  *Id.*  A "factual" attack made pursuant to Rule 12(b)(1) may be accompanied by extrinsic evidence.  *St. Clair v. City of Chico*, 880 F.2d 199, 201 (9th Cir. 1989); *Trentacosta v. Frontier Pac. Aircraft Indus.*, 813 F.2d 1553, 1558 (9th Cir. 1987).  "[N]o presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims."  *Thornhill*, 594 F.2d at 733.  Plaintiff must then come forward with evidence outside the pleadings to support his jurisdictional allegations.  *Trentacosta*, 813 F.2d 1558.

**MEMORANDUM DECISION AND ORDER - 6**

However, "[t]he relatively expansive standards of a 12(b)(1) motion are not appropriate for determining jurisdiction [pursuant to a "factual attack"] ... where issues of jurisdiction and substance are intertwined. A court may not resolve genuinely disputed facts where 'the question of jurisdiction is dependent on the resolution of factual issues going to the merits.'" *Roberts v. Corrothers*, 812 F.2d 1173, 1177 (9th Cir. 1987).

To the extent the issues become so intertwined, the summary judgment standard comes into play. Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal purposes of the summary judgment "is to isolate and dispose of factually unsupported claims . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id*. at 327.

"[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986). Material facts are those that may affect the outcome of the case. *See id*. at 248.

**MEMORANDUM DECISION AND ORDER - 7**

The moving party is entitled to summary judgment if that party shows that each issue of material fact is not or cannot be disputed. To show the material facts are not in dispute, a party may cite to particular parts of materials in the record, or show that the materials cited do not establish the presence of a genuine dispute, or that the adverse party is unable to produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(A)&(B); *see T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citing *Celotex*, 477 U.S. at 322). The Court must consider "the cited materials," but it may also consider "other materials in the record." Fed. R. Civ. P. 56(c)(3).

Material used to support or dispute a fact must be "presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Affidavits or declarations submitted in support of or opposition to a motion "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

The Court does not determine the credibility of affiants or weigh the evidence set forth by the non-moving party. All inferences which can be drawn from the evidence must be drawn in a light most favorable to the nonmoving party. *T.W. Elec. Serv.*, 809 F.2d at 630-31 (internal citation omitted).

Rule 56(e)(3) authorizes the Court to grant summary judgment for the moving party "if the motion and supporting materials–including the facts considered undisputed–show that the movant is entitled to it." The existence of a scintilla of evidence

**MEMORANDUM DECISION AND ORDER - 8**

in support of the non-moving party's position is insufficient. Rather, "there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby*, 477 U.S. at 252.

## ANALYSIS

### 1. FTCA and the Discretionary Function Exception

The FTCA waives the Government's sovereign immunity for tort claims arising out of negligent conduct of its employees acting within the scope of their employment. *Gager v. United States*, 149 F.3d 918, 920 (9th Cir. 1998). The discretionary function exception of the FTCA is a statutory reservation of sovereign immunity for a particular class of tort claims. *Id.* Conduct retains immunity from suit when the claim is "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a), *Green v. United States*, 630 F.3d 1245, 1249 (9th Cir. 2011).

There is a two part test to determine if the discretionary function exception applies. First, "the exception covers only acts that are discretionary in nature, acts that involve an element of judgment or choice." *United States v. Gaubert*, 499 U.S. 315 (1991) (quoting *Berkovitz v. United States*, 486 U.S. 531, 536 (1988)). If a federal statute, regulation or policy *requires* a particular course of action, the action is not considered discretionary. *Id.* at 322. Second, the discretion exercised must be "of the kind that the discretionary

**MEMORANDUM DECISION AND ORDER - 9**

function exception was designed to shield." *Id.* at 321-22.  The judgments and choices entitled to protection are those "grounded in social, economic and political policy." *United States v. Varig Airlines*, 467 U.S. 797, 814 (1984). "[I]t is the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function exception applies in a given case." *Id.* at 813.  Even day-to-day managerial decisions could be protected if they are "grounded in policy." *Gaubert*, 499 U.S. at 324. Therefore,  the relevant question becomes is the conduct "susceptible to policy analysis"? *Id.* at 325.

The discretionary function exception shields the United States from liability even if its actions were negligent.  *Id.* at 323.  "Negligence is simply irrelevant to the discretionary function inquiry."  *Kennewick Irr. Dist. v. United States*, 880 F.2d 1018, 1029 (9th Cir. 1989).

"[E]ach separate action must be examined to determine whether the specific actor had discretion of a type Congress intended to shield." *In re Glacier Bay*, 71 F.3d 1447, 1451 (9th Cir. 1995).  The Court should not parse the case too finely and lose sight of the big picture.  *General Dynamics v. United States*, 139 F.3d 1280, 1284-85 (9th Cir. 1998). The Court will therefore review each of the four discrete alleged negligent actions to determine if the discretionary function exception applies.  The Court will look to other Ninth Circuit FTCA cases involving forest fires for guidance in applying the exception in this particular case.

**MEMORANDUM DECISION AND ORDER - 10**

Finally, the burden is on the United States to prove the applicability of the exception. *Prescott v. United States*, 973 F.2d 696, 702 (9th Cir. 1992). Plaintiffs bear the burden of coming forth with sufficient evidence to establish there are genuine issues of material fact regarding the applicability of the exception. Miller v. United States, 163 F.3d 591, 594 (9th Cir. 1998).

### 2. Alleged Negligent Conduct

#### A. Forest Service Negligently Informed Landowners to Stay Away

Plaintiffs maintain the Forest Service told them to stay away from their properties and this prevented the property owners from being able to protect their properties from destruction. It is undisputed that the Forest Service gave landowners and other locals daily briefings regarding the Raines Fire and one homeowner was given a radio to track fire fighting efforts. The firefighters assigned to the Raines Fire were aware of the existence of the private properties and that one of the objectives of the Forest Service was to protect the private properties. It is undisputed that certain Forest Service personnel informed the homeowners that he did not believe the private properties were in danger. It is disputed whether the landowners were told they could not go to their property, it was not recommended they go to their properties, or that there was an aviation restriction that prevented certain landowners from flying into their properties.

Forest Service Fire Information Officer Mike Koehnke remembers speaking with Dr. Howard about the flight restrictions set by the Federal Aviation Administration, but

MEMORANDUM DECISION AND ORDER - 11

does not remember telling Dr. Howard or any other homeowner they could not or should not go to Copenhaver.   Jay Winfield testified that the Forest Service cannot force people to leave their property and that evacuations are handled county officials or the local sheriff's office. Dr. Howard remembers being told  he should not go to his property in Copenhaver.

It is also unclear from the record if the Incident Commander was aware of the location of the "main" Raines Fire or whether there was some confusion regarding the location of the "main" fire and spot fires being close to some of the private property.  It is also disputed as to whether or not the existence of the homeowners at their properties would or would not have prevented the destruction of private property once the wind event occurred on July 20th. The firefighters on the ground say the fire became so strong so quickly, it simply could not be stopped.

Effective communication regarding ongoing fires with the public, the media and landowners is an objective of the Forest Service.  Communications and daily briefings do not seem to fit the discretionary exception function as the communication process is informational in nature, not policy driven.  *Green v. United States*, 630 F.3d 1245, 1252 (9th Cir. 2011) (no evidence that decisions of when and whether to communicate directly with private property owners with property potentially in harm's way are susceptible to policy analysis). Forest Service personnel try to give correct information about the status and fire fighting plans at the daily briefings and meetings with landowners.  Having found the discretionary exception does not apply to this claim, there remains the question of

**MEMORANDUM DECISION AND ORDER - 12**

whether the alleged misinformation or even correct information regarding the safety status of the structures created a "duty" to the landowners that the Forest Service breached.  The fire fighting conditions for this particular fire changed over the course of a couple of hours.  Much of the change was due to the weather, not the actions or inactions of the firefighters.  Because genuine issues of material facts are disputed as to what the forest service advised the homeowners and whether or not the reliance on the communications would have made a difference to the structures that were destroyed are issues that need to be determined at trial when the Court can weigh the credibility of the witnesses, determine the information relayed and the impact of the information provided to landowners.

## B. Forest Service Failed to Track the Availability of Crews to Fight Fire

Plaintiffs do not challenge the discretionary decision to assign two fire crews to the Raines Fire.  Instead, they challenge the Incident Commander's failure to account for personnel resources which they claim is a mandatory function. The Forest Service responds that there is no mandatory directive listed in the policies cited by Plaintiffs that requires the Incident Commander himself to plan for crews timing out.  Moreover, the Forest Service claims the Resource Unit Leader planned for the timing out of the Lewis and Clark Hot Shots crew and planned for their replacement. The Government argues the undisputed fact the replacement crew arrived on July 20, 2007 after the fire blew up and

**MEMORANDUM DECISION AND ORDER - 13**

destroyed Plaintiffs' properties does not make the decision to time out the Lewis and Clark Hot Shots crew subject to review.

Idaho experiences numerous forest fires every year. Crews move from fire to fire all over the western United States. The Raines Fire was one of three forest fires the Incident Command Team was managing in July 2007.  Each evening the Incident Command Team developed an Incident Action Plan ("IAP") for the next day. The purpose of the IAP is to provide "written direction guidance for what the management team hopes to accomplish during the day, gives a written direction for activities that will take place on the ground. It briefs people on weather, fire behavior expectations and safety issues.  Provides an updated weather forecast."  Heintz Depo. at 18:14-22, Dkt. 18-5, p.2.  The management direction for the daily IAP's originates from the direction described in the Wildland Fire Situation Analysis ("WFSA")  and delegation authority. *Id.* at 29:5-19.

The Incident Command Team made a decision to assign two crews of 20 firefighters each to the Raines Fire beginning on the morning of July 17, 2007.  Due to helicopter maintenance issues, the transporting of crews and supplies was delayed about a day.  The Logan Hot Shots crew arrived on July 17, 2007 and the Lewis and Clark Hot Shots crew arrived on July 18, 2007.  The two crews worked the Raines Fire on July 18th and 19th.  The crews focused on constructing a fireline and setting up pumps and hoses for the purpose of protecting structures.  The Raines Fire continued to grow.

**MEMORANDUM DECISION AND ORDER - 14**

On or about July 19, 2007, the Incident Commander became aware the Lewis and Clark Hot Shots crew was going to time out on July 20, 2007.  Only one crew remained on the Raines Fire on July 20, 2007.  The replacement crew, the New Jersey Hot Shots crew, arrived in McCall on July 20, 2007, but did not make it to the Raines Fire until July 21, 2007.

Unlike the cases cited by the parties referencing a few discrete sections of related policy, Plaintiffs in this case have generally cited hundreds of pages of material to support their argument that the timing out of one hot shot crew was a violation of a mandatory requirement.  The Court has reviewed the hundreds of pages of documentation related to the Raines Fire.  The documentation clearly sets forth daily incident action plans, objectives, goals and guidelines in fighting forest fires in general and the Raines Fire specifically, but the documentation does not create mandatory personnel staffing requirements.  The plans, standards, objectives and guidelines do not eliminate discretion. "The existence of some mandatory language does not eliminate discretion when the broader goals sought to be achieved necessarily involve an element of discretion." *Miller v. United States*, 163 F.3d 591, 595 (9th Cir. 1998).   This makes sense as firefighting personnel are just one resource used to fight fires.  Cost, terrain, air support, equipment, water availability, demands of other fires, timing out of firefighters are policy considerations that must be balanced together and the alleged mandatory requirement to track and manage firefighters to allow for required periods of rest does not eliminate the discretion of the Incident Command Team to allocate resources.

**MEMORANDUM DECISION AND ORDER - 15**

While it is true the Incident Commander needed to stay on top of firefighters timing out and had "planned" for two crews, there is no mandatory requirement that once assigned, the number of crews must remain the same for the duration of the fire fighting efforts. It was a discretionary call on whether or not to seek an exception for the Lewis and Clark Hot Shots to continue working or to seek another hot shot crew to be assigned. This decision was based on social, economic and other policy considerations.

Because there were limited fire fighting resources and multiple on-going fires, this Court can find no mandatory directive that a certain number of firefighters had to be maintained under the circumstances that existed or that allowing the Lewis and Clark Hot Shots to time out late on the morning of July 20th and not be replaced until later that day was a violation of a mandatory directive. Rather, the Court finds the challenged action was discretionary in nature and the decision was based on considerations of public policy. *Miller v. United States*, 163 F.3d 591 (9th Cir. 1998); *Parsons v. United States*, 811 F. Supp. 1411 (E.D. Cal. 1992). This is the type of decision the discretionary function the exception was meant to shield from liability.

It is not the Court's job to determine whether the Forest Service made the correct decision. *Miller*, 163 F. 3d at 596. Even if this decision to release the Lewis and Clark Hot Shots was negligent, the decision is still protected by the exception. *United States v. Gaubert*, 499 U.S. 315, 426 (1991). *Id.* at 323. "Negligence is simply irrelevant to the discretionary function inquiry." *Kennewick Irr. Dist. v. United States*, 880 F.2d 1018, 1029 (9th Cir. 1989).

**MEMORANDUM DECISION AND ORDER - 16**

### C. Pumps and Hoses Were Not Properly Set Up

It is undisputed that one of the fire fighting objectives for the Raines Fire was to preserve private property.  Plaintiffs argue once the Forest Service determined it would protect structures on private property, it breached its duty to properly set up and maintain the pumps and hoses at the structures.  The facts relating to whether or not the pumps were properly set up, whether parts were damaged when there was a cargo drop, whether the fire damaged the pumps and hoses, whether the Forest Service had a duty to set up pumps and hoses that was breached and led to the claimed damages involves genuine issues of material fact that are disputed.

The facts relating to the pumps and hoses seems more like the cases where there is an argument about whether an agency failed to follow certain mandatory procedures. Implementation of safety or protection measures do not *always* involve policy considerations. The decision not to place a guardrail was discretionary while the decision allow a road to deteriorate below original road alignments was not discretionary.  *See ARA Leisure Services v. United States*, 831 F.2d 193 (9th Cir. 1987). It is at least arguable that once the discretionary decision was made to set up fire protection, the implementation of that protection needed to be done in a non-negligent manner.

Whether the firefighters were negligent in setting up or maintaining the hoses and pumps is disputed and unclear from the record before this Court.  If the fire burned through a hose, that does not necessarily mean the firefighters were negligent. Further, the decision to stop protecting certain properties after they caught fire, may be a discretionary

**MEMORANDUM DECISION AND ORDER - 17**

decision based on policy considerations of firefighter safety that trumps property protection. Finally, the Plaintiffs carry the burden of proving damages are related due to the alleged negligence.  Therefore, the Court finds this issue must be resolved at trial.

### D.  The Intentional Backburn Was Negligent

Plaintiffs do not challenge the decision to start a backburn (or backfire) which they appear to concede would be a discretionary decision "grounded in social, economic and political policy."  Instead, they challenge the conditions and manner the backburn was started.  The Forest Service maintains the "firing of the line" in the middle of the afternoon during high winds was not an intentional "backburn" but was more of a "backfire" done as a last ditch safety measure.  The United States argues even if the decision to fire the line under the existing conditions was negligent, it is still subject to the discretionary function exception.  The Court agrees it does not matter whether it was a decision to light a backburn, a backfire or the "firing of the line", all these decisions would be decisions immune from liability due to the discretionary function exception.

On the afternoon of July 20, 2007, the Raines Fire made a fast run to the Salmon River and the Plaintiffs' properties were destroyed.  Unlike some cases cited by the parties, the Raines Fire was not started by the Forest Service as a controlled burn.  It was started by lightening early in July.  It is undisputed that evening backburns had successfully slowed the Raines Fire prior to July 20, 2007.  It is undisputed that the Forest Service intended to do another backburn on July 20th to control the Raines Fire.  It is

**MEMORANDUM DECISION AND ORDER - 18**

undisputed that in the early afternoon of July 20th, high winds quickly strengthened the main Raines Fire causing spot fires.  It is undisputed that firefighters at the Lower Badley Ranch "fired the line" to create a safety zone and slow the fire down. There is no evidence that the firefighters who fired the line intended that to be the planned "backburn."   The "firing of the line" did not work at slowing the fire, but did create a safety zone.

There is speculation by some people (none of whom were not at the scene of the firing of the line), that the planned backburn must have been negligently set.  The Court finds there is no evidence the "firing of the line" was intended to be a "backburn" which is normally done at night and calm weather conditions and there is no evidence the admitted "firing of the line" was negligently implemented or caused the Raines Fire to do anything other than what the fire was ultimately going to do with the fuel and wind conditions that existed.  The record reflects that under the emergent situation on the afternoon of July 20th, the "firing of the line" was a discretionary call by the firefighters and was within the potential firefighting plan for the Raines Fire in such conditions on July 20th.

First, as conceded by Plaintiffs, the decision of how to fight a fire is generally discretionary in nature and involves an element of choice.  The Incident Command Team had been making daily choices on how to fight the fire based on weather predictions, public safety, firefighter safety, the demands of other ongoing fires, etc.  There was no "mandatory" Forest Service or fire fighting policy, objective, guideline or plan that

**MEMORANDUM DECISION AND ORDER - 19**

*required* the Incident Command Team or the firefighters on the ground to take certain action or that prevented the "firing of the line" decision.  While there may be "guidelines" on when is the best time to set "backburns" or "backfires" there is no mandatory policy cited by Plaintiffs that prevented the decision to fire the line on July 20th.  Nor have Plaintiffs cited any mandatory federal statute, regulation or policy that required a particular course of action.  Therefore, the decision to "fire the line," backburn or start a backfire, was a judgment call, discretionary in nature.

Second, the Court finds the decision to backburn, backfire, or fire the line is the kind of discretionary decision that the discretionary function exception was designed to shield.  The decision was grounded in policy considerations: social, economic, political policy, public safety, as well as limited resources due to the other on going fires.  It is this Court's judgment that it is hard to imagine a better example of a federal agency's discretionary call that better fits the discretionary function exception carved out by Congress.  Further, the finding is consistent with other courts reviewing similar forest fire fighting decisions where the fire was one of many fires and was originally started by lightening (not by the federal agency).  *See Miller; Defrees v. United States*, 738 F. Supp. 380 (D. Or. 1990), *Graves v. United States*, 2007 WL 776101 (E.D. Cal. 2007); *Parsons v. United States*, 811 F.Supp. 1411 (E. D. Cal. 1992).

Third, even assuming the decision to backburn, backfire or fire the line during the high wind events of July 20th was negligently made, the decision is still protected by the discretionary function exception.  *Kennewick Irr. Dist. v. United States*, 880 F.2d 1018,

**MEMORANDUM DECISION AND ORDER - 20**

1029 (9th Cir. 1989).  The Court respectfully rejects Plaintiffs' request to parse the decision to fire the line into a second decision to fire the line in windy conditions with a fire approaching.  The discretionary decision to "fire the line" was made with the weather conditions and fast approaching fire in mind and it was known such conditions were not ideal conditions for firing the line.  To parse the decision into two parts would defeat the purpose of the discretionary function exception and the well-settled law that the negligence associated in making discretionary decision is still protected.

Finally, this case is clearly distinguishable from the facts in *United States v. Green*, 630 F.3d 1245 (9th Cir. 2011) where firefighters started a backfire but did not take any action to protect private property.  The court in *Green* determined that the discretionary function did not prevent a claim against the Forest service The Forest Service admitted in *Green* that firefighters had not been informed of the existence of the private properties and had not instructed them to defend such properties.

Here, the Incident Command Team planned a backburn for later that day, was aware of the possibility that a backfire or firing of the line could be done under the predicted afternoon weather conditions as an emergency response, was aware of the private properties at issue, and had taken steps to protect the private properties.  Unlike the planned backfire in *Green*, it does not appear there was adequate time to notify the private property owners of the change in firefighting plans when the winds kicked up.  The fire simply moved too fast.  Furthermore, there is no evidence the Raines Fire would not have reached the private properties whether or not there was a "firing of the line" as

**MEMORANDUM DECISION AND ORDER - 21**

the fire had spread to the crowns of the trees prior to the firing of the line. In *Green*, the backfire exceeded the containment area.  In the case at bar, the record reflects the existing fire overwhelmed the backfire that was set by "firing the line." In *Green*, the private property owners were not notified of the risk of the backfire. In the present case, Plaintiffs acknowledge they were aware of prior backburns and do not dispute a backburn was even planned for July 20th.  All of these factual differences  distinguish the present case from the *Green* case regarding this alleged negligent act.

## ORDER

**IT IS ORDERED:**

1.  Defendant's Motion to Dismiss or for Summary Judgment (Dkt. 13) is **GRANTED IN PART AND DENIED IN PART** consistent with the Memorandum Decision and Order.  The two alleged acts of negligence regarding communications to private property owners and implementation of hoses and pumps to protect certain structures will be set for trial after the parties have time to participate in mediation and check the availability of witnesses.  Counsel shall file proposed trial dates with the Court if mediation of the remaining claims is unsuccessful.

DATED:  **February 20, 2014**

Honorable Edward J. Lodge
U. S. District Judge

**MEMORANDUM DECISION AND ORDER - 22**